FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

R. MORENO, in his individual
capacity and in his capacity as
representative of the classes
described fully herein,
                    *Plaintiff-Appellee,*

v.

LEROY BACA; MICHAEL
ANTONOVICH; YVONNE BURKE;
DONALD KNABE; GLORIA MOLINA;
ZEV YAROSLAVSKY,

                    *Defendants,*

and

BANKS, Deputy Sheriff # 403862;
GARCIA, Deputy Sheriff # 412525,
                    *Defendants-Appellants.*

No. 02-55627

D.C. No.
CV 00-07149 ABC

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
April 9, 2003—Pasadena, California
Submission Withdrawn October 8, 2003
Resubmitted February 16, 2005

Filed March 7, 2005

Before: Harry Pregerson, A. Wallace Tashima, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Tashima;
Concurrence by Judge Clifton

2657

**COUNSEL**

Devallis Rutledge, Manning & Marder Kass, Ellrod, Ramirez, Irvine, California, for defendants-appellants.

Kathryn S. Bloomfield, Yagman & Yagman & Reichmann & Bloomfield, Venice Beach, California, for plaintiff-appellee.

**OPINION**

TASHIMA, Circuit Judge:

Los Angeles County Deputy Sheriffs Sean Banks and Thomas Garcia ("Appellants") appeal from the district court's denial of their motion for summary judgment asserting qualified immunity in a § 1983 action brought by plaintiff Richard Moreno. Moreno alleges that Appellants, acting under color of state law, deprived him of his constitutional rights when they arrested and searched him without cause.

**Factual Background**

One evening in January 2000, Richard Moreno and his companion Joe Rodriguez were on their way to a meeting at St. Lucy's Church in the City Terrace area of Los Angeles. After their car broke down, Moreno and Rodriguez proceeded toward the meeting on foot. At approximately 7 p.m., a marked Los Angeles County Sheriff patrol car passed them as they walked down the street, made a U-turn, and pulled the car onto the curb in their path. Two deputies got out of the car. Deputy Banks, who was riding in the passenger seat, ordered Moreno and Rodriguez to approach. Banks interro-

gated both men as to their business in the area, patted them down for weapons, emptied the contents of their pockets onto the hood of the patrol car, and locked them into the back seat. While Moreno and Rodriguez sat in the back seat of the car, Deputy Banks entered their names into a computer inside the patrol car and asked the men whether they were on parole. Moreno admitted that he was.

Meanwhile, Deputy Garcia, the driver of the patrol car, walked down the sidewalk in the direction from which Rodriguez and Moreno had approached, shining his flashlight on the sidewalk and into nearby yards as he went. When Garcia returned to the patrol car he had a discussion with Banks, reached into the glove compartment to retrieve a ziploc bag, and then put the bag back into the glove compartment and closed the door. Moreno heard one of the deputies tell the other that Rodriguez was "clean" but that Moreno was on parole. At that point, Garcia opened the rear door of the car and told Rodriguez that he was free to leave, which he did. Moreno was handcuffed and told that he was under arrest for violating his parole. When Moreno asked the deputies what he had done to violate his parole, one of them told him that he was caught in possession of rock cocaine.

Deputies Banks and Garcia gave a somewhat different account of the incident. According to their incident report, Banks noticed that Moreno was "startled" when he saw the patrol car. As the deputies approached, Moreno turned around, reached into his right front pants pocket, and discarded something on the front steps of a nearby residence. Because the deputies were on patrol in a high crime area, and because they were aware that drugs were sold in several houses nearby, they decided to investigate. They detained Moreno and placed him in the patrol car. Banks walked to the area in which he had seen Moreno discard the object and recovered an object he recognized as rock cocaine. One of the deputies did a warrant check on the patrol car's MDT terminal, which revealed an outstanding arrest warrant with

$10,000 bail for Moreno.[1] The MDT search also revealed that Moreno was on parole, a fact which Moreno orally confirmed. Both deputies declared under oath that they were aware from their training and experience that a standard term of parole was that parolees were subject to warrantless searches by any peace officer. Moreno was placed under arrest, both for possession of cocaine and under the authority of the outstanding arrest warrant, and a parole hold was placed on him. Although the incident report makes no reference to Rodriguez or any other person, both Banks and Garcia refer to "another man" in their sworn declarations describing the encounter.

At the time of the detention, Moreno was indeed a parolee under the supervision of the California Department of Corrections. He had been released from prison more than two years earlier, subject to the following condition: "You and your residence and any property under your control may be searched without a warrant by an agent of the Department of Corrections or any law enforcement officer." As it turns out, Moreno also had an outstanding arrest warrant, which was issued when Moreno failed to make an appearance in state court in 1999. It is undisputed, however, that the deputies learned that Moreno was on parole and that he had an outstanding arrest warrant only after searching and detaining him.

Moreno was subsequently charged in state court with possession of a controlled substance. Deputies Banks and Garcia testified against him at trial and Rodriguez testified for the defense. Moreno was acquitted by a jury in 2002.

Moreno then brought this action under 42 U.S.C. § 1983, contending that Banks and Garcia violated his Fourth Amendment right to be free from unreasonable searches and seizures when they arrested and searched him without cause. Banks

---

[1]An MDT terminal gives deputy sheriffs access to certain criminal records, and can alert officers to the possibility of outstanding arrest warrants.

MORENO v. BACA

and Garcia responded that Moreno had no right to be free from suspicionless arrests and searches because of the outstanding bench warrant and the parole condition. Even if reasonable suspicion were required to detain Moreno, the officers contended, they had the requisite level of suspicion because of Moreno's nervous behavior and the fact that he was walking in a "high crime" area. The district court sided with Moreno, reasoning that under *Griffin v. Wisconsin*, 483 U.S. 868 (1987), and *United States v. Knights*, 534 U.S. 112 (2001), "at least reasonable suspicion is required to justify the search, and subsequent seizure, of Moreno." The court further held that, interpreting the facts in the light most favorable to Moreno, the facts "do not come close to the level of suspicion that existed in *Knights* and *Griffin*." It rejected the deputies' argument that Moreno's parole search condition and the outstanding arrest warrant retroactively justified the arrest and search even though neither Banks nor Garcia was aware of either circumstance at the time. The court denied the deputies' motion for summary judgment on qualified immunity grounds, holding that Moreno's constitutional right to be free from suspicionless searches was "clearly established" at the time of the detention, and that a suspect's nervousness at the sight of law enforcement, by itself, did not give rise to reasonable suspicion.

The deputies brought this interlocutory appeal of the district court's denial of summary judgment on qualified immunity grounds. We have jurisdiction over the appeal, but only to the extent that it presents legal questions. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) ("Our jurisdiction [to review the denial of qualified immunity] generally is limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact.").

I.

We review the district court's denial of a motion for summary judgment de novo. *Billington v. Smith*, 292 F.3d 1177,

1183 (9th Cir. 2002). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). "[T]he ordinary framework for deciding motions for summary judgment" applies to motions for summary judgment based on official immunity. *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). Because the moving defendant bears the burden of proof on the issue of qualified immunity, he or she must produce sufficient evidence to require the plaintiff to go beyond his or her pleadings. *Id.* The defendant's burden is to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[1] The determination of whether a law enforcement officer is entitled to qualified immunity involves a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the first step we must view the record in the light most favorable to the party asserting injury in determining whether the officer's conduct violated a constitutional right. *Id.* If the plaintiff establishes the violation of a constitutional right, we must next consider whether that right was clearly established at the time the alleged violation occurred. *Id.* The contours of the right must have been clear enough that a reasonable officer would have understood that what he or she was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

## II

Appellants challenge the district court's order on two fronts. Their primary contention is that Moreno had no Fourth Amendment rights that could have been violated by virtue of the parole condition allowing warrantless searches of his person, residence, and property. They further assert that the arrest and search were justified by the parole search condition and the outstanding arrest warrant, despite the fact that the depu-

ties did not know of either fact at the time. We reject both these contentions.

### A.    Did the Suspicionless Detention Violate Moreno's Fourth Amendment Right to Be Free From Unreasonable Searches and Seizures?

[2] The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The "touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted). The "reasonableness" mandated by the Fourth Amendment generally requires law enforcement officers to obtain a warrant supported by probable cause prior to conducting a search. *Payton v. New York*, 445 U.S. 573, 586 (1980). When applied in circumstances that make the warrant requirement impracticable, however, the "reasonableness" standard can be met even in the absence of a warrant. *Warden v. Hayden*, 387 U.S. 294, 298 (1967). And, in extraordinary situations in which the government has a "special need, beyond ordinary law enforcement," the reasonableness standard can be met even in the absence of probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 347 (1985).

[3] But the doctrines that the Court has crafted to respond to these unique situations are merely a gloss on the reasonableness standard embodied in the text of the Fourth Amendment itself. In the absence of controlling case law, our central inquiry in Fourth Amendment search and seizure cases remains whether the search or seizure was reasonable in light of "all the circumstances surrounding the encounter." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). We applied the "reasonableness"

test to evaluate the warrantless search of a parolee in *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975) (en banc). *See id.* at 248-49 (holding that "[parole] searches may be held illegal and the evidence obtained therefrom suppressed unless they pass muster under the Fourth Amendment test of reasonableness").[2] In evaluating whether the suspicionless search and seizure of Moreno was "reasonable," we balance "the degree to which the intrusion intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate governmental interests."[3] *Knights*, 534 U.S. at 118-19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

## 1. *The Privacy Interests of Parolees*

[4] We begin our analysis by rejecting Appellants' contention that Moreno, by the very nature of his status as a parolee, had no Fourth Amendment rights at all. We rejected an identi-

---

[2]More recently, in *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004) (en banc), *petition for cert. filed*, (U.S. Nov. 15, 2004) (No. 04-7253), we were unable to resolve the proper test to be applied to determine whether an involuntary blood draw from a supervised releasee for a DNA databank violated the Fourth Amendment. *See id.* at 842 n.1 (Reinhardt, J., dissenting).

[3]Because the arrest and search at issue in this case were clearly for law enforcement purposes, the "special needs" doctrine does not apply. *See Ferguson v. City of Charleston*, 532 U.S. 67, 83 n.20 (2001) ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes."); *City of Indianapolis v. Edmond*, 531 U.S. 32, 38 (2000) (observing that the "special needs" doctrine has never been applied where the purpose of the search was "to detect evidence of ordinary criminal wrongdoing"); *see also Kincade*, 379 F.3d at 854 (Reinhardt, J., dissenting) ("Never in over two hundred years of history has the Supreme Court approved of a suspicionless search designed to produce ordinary evidence of criminal wrongdoing for use by the police."). Even assuming that parole supervision can qualify as a "special need," Appellants cannot reasonably contend that the search was conducted for the purpose of supervising parolees, *see Griffin*, 483 U.S. at 873, because they did not know that Moreno was a parolee at the time of the incident.

cal argument three decades ago in *Latta*. *See Latta*, 521 F.2d at 248 ("It is . . . too late in the day to assert that searches of parolees by their parole officers present no Fourth Amendment issues."). The Fourth Amendment by its explicit terms applies to all persons, regardless of their status under the law.

In *Griffin*, the Supreme Court confronted the question of whether and to what extent the Fourth Amendment limits the government's ability to search probationers, who, like parolees, are offered conditional liberty as an alternative to incarceration. A Wisconsin regulation permitted any probation officer to search a probationer's home without a warrant so long as there were "reasonable grounds" to believe that contraband would be found. 483 U.S. at 871. Acting in response to a tip that the probationer kept guns in his apartment, but without a warrant, a probation officer searched Griffin's home and recovered a gun there. The probationer moved to suppress the gun in a subsequent felony trial in state court, but the motion was denied. The Supreme Court affirmed, holding that the "reasonable grounds" standard satisfied the Fourth Amendment's "reasonableness" requirement. *Id.* at 873. The Court began by recognizing that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be "reasonable." *Id.* Although the Court acknowledged that a search of a home must generally be authorized by a warrant supported by probable cause, it reasoned that Wisconsin's interest in supervising its probationers constituted a "special need" beyond ordinary law enforcement, *see T.L.O.*, 469 U.S. at 351, which permitted a "degree of impingement on privacy that would not be constitutional if applied to the public at large." 483 U.S. at 875.

> Probation is simply one point (or more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum security facility to a few hours of mandatory community service. A number of different options lie between those extremes, including confinement

> in a medium- or minimum-security facility, work release programs, "halfway houses," and probation — which itself can be more or less confining depending on the number and severity of restrictions imposed . . . . To a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy the "absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions."

*Id.* at 874 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)) (statutory citation omitted) (first ellipsis added; other alterations in the original).

The Court recently reaffirmed the principle that probation "significantly diminish[es]," but does not extinguish, an individual's reasonable expectation of privacy. *Knights*, 534 U.S. at 119. In *Knights*, a probationer had explicitly agreed to submit his person and property to a search "at anytime, with or without a search warrant, warrant of arrest, or reasonable cause" as a condition of his release. *Id.* at 114. The probationer and his colleague were suspected of having vandalized several Pacific Gas and Electric ("PG&E") facilities in connection with an ongoing dispute between Knights and the company over theft of services. A detective assigned to investigate noticed that acts of vandalism tended to coincide with the probationer's court dates in the theft-of-services dispute, and decided to place the probationer's home under surveillance. In the bed of a truck parked in the petitioner's driveway, he saw a gasoline can, a molotov cocktail, and brass padlocks matching the description of padlocks pried from a vandalized PG&E transformer vault. At one point he observed the probationer's colleague walk out of the house with what appeared to be pipe bombs. Knowing that the probationer was subject to the condition that his property may be searched without cause, the officer conducted a warrantless search of Knight's home.

The probationer successfully moved to suppress the evidence on Fourth Amendment grounds, and we affirmed, but the Supreme Court reversed. The Court concluded that the search "was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances.' " *Id.* at 118 (quoting *Robinette*, 519 U.S. at 39). The Court reasoned that the probationer's agreement to submit to suspicion-less searches "significantly diminished [his] reasonable expectation of privacy" and that the state had a significant interest in supervising probationers, who were more likely than ordinary citizens to violate the law. *Id.* at 119-21. Nonetheless, the Court still held that reasonable suspicion was required to search the probationer's house, stating that a "lesser than probable-cause standard" satisfied the Fourth Amendment "when the balance of governmental and private interests makes such a standard reasonable." *Id.* at 121. Relying on the fact that the detective had a "reasonable suspicion" that evidence of the PG&E crimes would be found, the court held that the search did not violate the Fourth Amendment because there was "enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.*

**[5]** Because of the similarity of their relationship vis-a-vis the government, we have treated parolees and probationers essentially the same for the purpose of Fourth Amendment analysis. *See Kincade*, 379 F.3d at 817 n.2 ("Our cases have not distinguished between parolees, probationers, and supervised releasees for Fourth Amendment purposes."); *United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991) ("We do not believe the distinction between the status of parolee and that of a probationer is constitutionally significant for purposes of evaluating the scope of a search."); *United States v. Harper*, 928 F.2d 894, 896 n.1 (9th Cir. 1991) ("Nor do we see a constitutional difference between probation and parole for purposes of the fourth amendment."). Like probationers, parolees are entitled to "conditional liberty properly dependent on observance of special . . . restrictions." *Morrisey*, 408

U.S. at 480; *see also Penn. Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 365 (1998) (describing parole as a condition in which "the State accords a limited degree of freedom in return for the parolee's assurance that he will comply with the often strict terms and conditions of his release"). Whereas a probationer's release is premised on the idea that he or she can serve a meaningful sentence without being incarcerated, a parolee's release is designed to provide a transition period between incarceration and complete freedom. But, in either case, some degree of privacy and autonomy is inherent in the offender's status.

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life.

*Morrisey*, 408 U.S. at 480; *see also Latta*, 521 F.2d at 250 (holding that "the parolee's interest in maintaining his personal privacy, even as against his parole officer, is in many respects like that of other citizens"). Thus, the condition of a parolee is "very different from that of confinement in a prison," and it "includes many of the core values of unqualified liberty." *Morrisey*, 408 U.S. at 480.

**[6]** The conditions of Moreno's parole are only marginally relevant to our analysis. At most, the parole agreement is a "salient circumstance" which we must weigh in determining whether the search and seizure in this case was reasonable. *Knights*, 534 U.S. at 118. In *Knights*, the court held that the offender's probation condition, in which he agreed to submit to suspicionless searches, "significantly diminished [his] rea-

sonable expectation of privacy" because the "probation order clearly expressed the search condition and [he] was unambiguously informed of it." *Id.* at 120. In this case, by contrast, although Moreno's parole agreement provides that officers may conduct a *warrantless* search and seizure of his person, it does not permit officers to conduct a *suspicionless* arrest and seizure.[4] Random searches not premised on individualized suspicion are not contemplated by the parole conditions.[5] *Cf. Rowe v. Lamb*, 130 F.3d 812, 814 (8th Cir. 1997) (holding that a warrantless search of a probationer's home was reasonable where the probationer agreed as a term of his probation to be subject to warrantless searches with or without probable cause). Moreno cannot be accused of manifesting a subjective expectation that he would be vulnerable to suspicionless searches simply because he signed the parole agreement. And his agreement to submit to *warrantless* searches cannot be said to reduce his privacy rights so severely as to make a *suspicionless* search reasonable.

## 2. *The Degree of the Intrusion*

Having clarified that parolees are entitled to the protection of the Fourth Amendment, we must decide the extent to which the Fourth Amendment protected Moreno from the intrusion in this case. In doing so, we weigh the intrusiveness of the search and seizure taking into account the context in which they occurred, because the "specific content and incidents" of Moreno's right to privacy depend on "the context in which it is asserted." *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

---

[4]Similarly, in *United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2004) (en banc), *cert. denied*, 125 S. Ct. 863 (2005), in which we assumed without deciding that a search of a parolee violated the Fourth Amendment, *id.* at 1054, the parole document provided for "search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant, *and with or without cause*," *id.* at 1051 (emphasis added).

[5]For that reason, we find it unnecessary to address Appellants' alternative theory that Moreno gave advance consent to the search.

**[7]** Whatever the extent of Moreno's Fourth Amendment rights, they clearly included the right to walk along a public sidewalk unmolested by law enforcement.

> Personal liberty, which is guaranteed to every citizen under our constitution and laws, consists of the right of locomotion, to go where one pleases, and when, and to do that which may lead to one's business or pleasure, only so far restrained as the rights of others may make it necessary for the welfare of all other citizens. One may travel along the public highways or in public places; and while conducting themselves in a decent and orderly manner, disturbing no other, and interfering with the rights of no other citizens, there, they will be protected under the law, not only their persons, but in their safe conduct. The constitution and the laws are framed for the public good, and the protection of all citizens from the highest to the lowest; and no one may be restrained of his liberty, unless he has transgressed some law.

*Lawson v. Kolender*, 658 F.2d 1362, 1368 n.13 (9th Cir. 1981) (quoting *People v. De Fillippo*, 262 N.W.2d 921, 924 (Mich. Ct. App. 1977) (quoting *Pinkerton v. Verberg*, 44 N.W. 579, 582-83 (Mich. 1889)), *rev'd on other grounds*, 443 U.S. 31 (1979); *see also United States v. Mendenhall*, 446 U.S. 544, 550 (1980) ("There is no question . . . that the respondent [had a] constitutional right of personal security as she walked through the Detroit Airport . . . ." ); *Terry*, 392 U.S. at 9 ("Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland.") (citations omitted).

In *Terry*, the State argued that a pat-down of a suspect's body for weapons was a *de minimis* intrusion for the purpose of Fourth Amendment analysis. *Id.* at 16. Although the Court agreed that a limited stop-and-frisk was less intrusive than a full-blown arrest and search, it "emphatically rejected" the

State's contention that the intrusion was constitutionally insignificant:

> It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a "search." Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity." *It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.*

*Id.* at 16-17 (emphasis added). The Court went on to describe the encounter as an "annoying, frightening, and perhaps humiliating experience." *Id.* at 25; *cf. Kincade*, 379 F.3d at 836 (plurality opinion) (stating that the intrusion occasioned by a compulsory blood test was " 'not significant' " because it involves " 'virtually no risk, trauma, or pain' ") (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 625 (1989)).

**[8]** The search to which Moreno was subjected must also have been annoying, frightening, and humiliating. He was ordered to assume a vulnerable position for an investigatory pat-down, his personal effects were emptied onto the hood of a marked patrol car in full view of the neighborhood, and he was locked into the back seat of the patrol car. Whereas *Terry* involved the comparatively minor intrusion of an investigatory detention and a pat-down for weapons, there is little doubt that Moreno and his companion were subject to a full-blown arrest and search. Moreno could not reasonably have concluded that he was free to go about his business when he

was locked inside the patrol car. *See Bostick*, 501 U.S. at 437 (holding that in determining whether one has been seized, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business' ") (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). And the fact that Moreno was locked in the car after he was patted down and questioned makes it impossible to argue that the detention was anything but a full custodial arrest. *See Dunaway v. New York*, 442 U.S. 200, 212 (1979); *Florida v. Royer*, 460 U.S. 491, 499 (1983) ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest."). Moreno certainly had a legitimate expectation of privacy with respect to the contents of his pockets, especially in light of the fact that a *Terry* patdown had previously been conducted and no weapons or contraband were found. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993); *United States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001). We are confident that no court would countenance the intrusion to which Moreno was subjected, were it imposed on an ordinary person unfettered by parole conditions, unless it was supported by probable cause.

### 3. *California's Interest in Supervising its Parolees*

"In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements. The State thus has an overwhelming interest in ensuring that a parolee complies with those requirements and is returned to prison if he fails to do so." *Scott*, 524 U.S. at 365.

California's interest in supervising parolees, like its interest in supervising probationers, is twofold. First, it has an interest

in ensuring that its offenders successfully complete their terms and become integrated back into the community. *See Knights*, 534 U.S. at 120; *Griffin*, 483 U.S. at 875 (noting that probation conditions are "meant to assure that the probation serves as a period of genuine rehabilitation"). Second, it has an interest in protecting the public from the harm that recidivist parolees can cause.[6] *See Latta*, 521 F.2d at 249 (plurality opinion) (describing the duty of parole officers to "prevent[ ] possible further antisocial or criminal conduct by the parolee"). The traditional assumption has been that close supervision promotes the purposes of parole by reducing an offender's opportunity to commit another crime or otherwise violate the terms of his or her release. *See Griffin*, 483 U.S. at 875 (holding that "more intensive supervision can reduce recidivism") (citing Petersilia, Probation and Felony Offenders, 49 Fed. Probation 9 (June 1985)).

[9] But our task is not simply to weigh the gravity of California's interests in rehabilitating its parolees and protecting its citizens; we must also assess the degree to which suspicionless searches actually advance those interests. *See Knights*, 534 U.S. at 118-19. It is not clear that suspicionless searches advance either the deterrent or rehabilitative purpose of parole. More recent studies suggest that close supervision of offenders has relatively little impact on recidivism rates. Joan Petersilia, A Decade of Experimenting with Intermediate Sanctions: What Have We Learned? 62 Federal Probation 3, 6 (Dec. 1998) (finding that close supervision "did not decrease subsequent arrests or overall justice system costs," and rejecting the premise that "increased surveillance acts as a constraint on the offender and that the likelihood of detec-

---

[6]California has the highest recidivism rate in the nation, with 70 percent of its paroled felons re-offending within the first 18 months of their release. *Crawford*, 372 F.3d at 1069 (Trott, J., concurring) (citing Joan Petersilia, Challenges of Prisoner Reentry and Parole in California, 12 CPRC (June 2000)). A full 68 percent of adult parolees are returned to prison: 55 percent for a parole violation and 13 percent for the commission of a new felony offense. *Id.*

tion acts as a deterrent to crime"). After all, parole is intended to provide a transition between prison, which allows for very little privacy, and freedom, inherent in which is a great deal of privacy. In sum, the State has not shown that suspicionless searches, which mimic the conditions of prison, significantly advances the purposes of parole beyond searches based on a reasonableness requirement.

### 4   *The Reasonable Suspicion Standard*

**[10]** Apart from cases presenting a "special need, beyond ordinary law enforcement," courts have generally required some level of individualized suspicion in order to meet the Fourth Amendment's "reasonableness" test.[7] The Supreme Court emphasized the existence of a "reasonable suspicion" when it affirmed the probation searches in both *Griffin*, 483 U.S. at 871, and *Knights*, 534 U.S. at 121. We cited the "reasonable suspicion" standard when evaluating the constitutionality of a parole search in *United States v. Dally*, 606 F.2d 861, 863 (9th Cir. 1979) (holding that a parole search was "reasonable" under the Fourth Amendment because the parole officer had a "reasonable belief" that the parolee had violated his parole by changing addresses), and after concluding that the Fourth Amendment rights of parolees and probationers were indistinguishable, we applied the "reasonable suspicion" standard when evaluating the search of a probationer in *Davis*, 932 F.2d at 758 ("The permissible bounds of a probation search are governed by a reasonable suspicion standard."). *See also United States v. Stokes*, 292 F.3d 964, 967 (9th Cir.

---

[7]Even "special needs" cases have required individualized suspicion in order to conduct targeted searches of individuals. *See T.L.O.*, 469 U.S. at 347; *Griffin*, 483 U.S. at 879-880. The only truly suspicionless searches that have been permitted under the "special needs" doctrine involve cases in which blanket searches or seizures of broad groups of individuals were required. *See, e.g., Illinois v. Lidster*, 540 U.S. 419, 124 S. Ct. 885, 889 (2004) (checkpoint established to question all motorists regarding a crime in the area); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 665 (1995) (suspicionless drug testing of student athletes).

2002) (holding that "the probation officer was entitled to carry out a search of Stokes' vehicle with no more than reasonable suspicion that he was engaged in criminal activity"). Even were we free to do so, we see no reason to abandon that standard here. Taking into account the reduced privacy rights enjoyed by parolees and the State's interest in rehabilitating parolees and deterring crime, we hold that the Constitution requires that a law enforcement officer must, at minimum, have a reasonable suspicion that a parolee has engaged in criminal wrongdoing or violated his parole prior to arresting him or conducting a search of his person.[8]

[11] Viewing the evidence in the light most favorable to Moreno, we conclude that Appellants lacked reasonable suspicion to detain and search him. Neither Banks nor Garcia had received any information that would cause them to suspect Moreno of any illegal activity. Banks asserts that Moreno was in a high crime area and looked nervous on seeing the police car. But Moreno denies reaching into his pocket, or bending to his side and placing anything on the ground. These facts, when viewed in the light most favorable to Moreno, do not give rise to reasonable suspicion. *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001) (holding that "nervousness alone" does not give rise to reasonable suspicion), *amended by* 279 F.3d 1062 (9th Cir. 2002); *United States v. Garcia-Camacho*, 53 F.3d 244, 247 (9th Cir. 1995) (holding that a "surprised" and "terrified" look on the defendant's face when pulled over by law enforcement does not give rise to reasonable suspicion); *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992) (holding that the defendant's repeated glances at law enforcement officers through a

---

[8]The concurring opinion relies heavily on Judge Trott's concurring opinion in *Crawford* that the applicable standard should be that a parole search not be "arbitrary, capricious, or harassing." Concurrence at 2692, 2693. Regardless of Judge Trott's reasoning in his *Crawford* concurrence, however, the court's opinion in *Crawford* explicitly declined to consider what level of suspicion was required to justify the search at issue. *See Crawford*, 372 F.3d at 1054.

rear-view mirror did not give rise to reasonable suspicion), *amended by* 997 F.2d 1306 (9th Cir. 1993); *cf. Stokes*, 292 F.3d at 967-68 (holding that the reasonable suspicion standard was met where the officer knew the defendant, knew that the defendant was on probation subject to a search condition, and had reliable information linking defendant to the theft of guns from his co-worker).

### B. Did the Existence of the Outstanding Bench Warrant Retroactively Justify the Arrest and Search?

[12] Appellants argue in the alternative that the search was reasonable under the Fourth Amendment because there was an outstanding misdemeanor warrant for Moreno's arrest. We agree that, depending on its contents and the manner in which it was executed, the existence of an arrest warrant could have rendered Moreno's arrest "reasonable," *cf. United States v. Leon*, 468 U.S. 897, 914 (1984), and that a search incident to a lawful arrest would have been permissible under *United States v. Robinson*, 414 U.S. 218, 235 (1973). It is undisputed, however, that Deputies Banks and Garcia were not aware of Moreno's outstanding arrest warrant at the time of the seizure. Thus, we must confront the question of whether a search or seizure can be considered "reasonable" if the fact that rendered the search "reasonable" (in this case, the outstanding arrest warrant) was unknown to the officer at the time of the intrusion.[9] We hold that it cannot.

---

[9]We need not reach the separate question of whether the search was retroactively justified by the existence of a parole condition that rendered the suspicionless search reasonable, because we hold that the search would not have been reasonable even if the officers knew of Moreno's status as a parolee and the conditions of his parole at the time of the arrest and search. But we note that the California Supreme Court rejected an identical argument in *People v. Sanders*, 73 P.3d 496 (Cal. 2003), when it held that the "police cannot justify an otherwise unlawful search of a residence because, unbeknownst to the police, a resident of the dwelling was on parole and subject to a search condition." *Id.* at 505. The court concluded

It is well established that under the Fourth Amendment, to arrest a suspect on probable cause, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 137 (1978); *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("We have described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity, and probable cause to search as existing where the *known facts and circumstances* are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.") (emphasis added) (citation omitted); *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (holding that "factual determinations bearing upon search and seizure" must be judged against an "objective standard" based on "facts available to the officer at the moment").[10]

---

that while parolees have a reduced expectation of privacy, they "need not anticipate that officers with no knowledge of the probationer's existence or search condition may freely invade their residence in the absence of a warrant or exigent circumstances." *Id.* at 504 (quoting *People v. Robles*, 3 P.3d 311, 317 (Cal. 2000)). The court noted that its decision "flows from the rule that whether a search is reasonable must be determined based upon the circumstances known to the officer when the search is conducted." *Id.* at 505.

[10] *See also Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003); *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) ("Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.") (emphasis added); *Taylor v.*

In *United States v. Luckett*, 484 F.2d 89 (9th Cir. 1973) (per curiam), we held that a police officer's knowledge that a man was subject to an outstanding bench warrant, which he acquired only after unlawfully seizing the man, did not retroactively render the seizure of that man "reasonable" under the Fourth Amendment. *Id.* at 90-91. In that case, the officer spotted a man jaywalking and summoned him to his police car. After reviewing the man's identification, the officer detained the man long enough to write a jaywalking citation. We held that the temporary seizure during which the police checked the man's identification and wrote the citation was reasonable under the Fourth Amendment because it was " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 90 (quoting *Terry*, 392 U.S. at 16, 19). But the officer continued to detain the man after the citation was written for the sole purpose of running a warrant check on him. The warrant check turned out positive, and the officer arrested him on that basis. A search incident to that arrest revealed a package of counterfeit money orders. We held that the detention of the man for the purpose of running the warrant check was "unreasonable," and the evidence was properly suppressed at trial, because at the time it was conducted, the officer "had no reasonable grounds to be suspicious that there might be a warrant outstanding against him." *Id.* at 91; *see also United States v. Johnson*, 256 F.3d 895, 903 (9th Cir. 2001) (en banc) (Ferguson, J., joined by Schroeder, Pregerson, and Paez, JJ.) ("We have never held that an officer lacking any prior objective knowledge of the use of an out-

_____

*Waters*, 81 F.3d 429, 434 (4th Cir. 1996) ("In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer *at the time of the arrest*.") (emphasis added). Indeed, in addressing the converse situation, in which law enforcement officers arrested a man because they reasonably believed that an outstanding arrest warrant existed when in fact it did not, the Supreme Court found that the seizure was "reasonable" (for the purpose of applying the "good faith" exception to the exclusionary rule) precisely because it was justified based on the facts known to the officers at the time. *Leon*, 468 U.S. at 926.

building may approach it free of Fourth Amendment constraints."); *United States v. DiCesare*, 765 F.2d 890, 899 (9th Cir. 1985) ("[T]he acquisition of probable cause during an unlawful seizure does not cure the illegality and does not constitute an independent source of probable cause."), *amended by* 777 F.2d 543 (9th Cir. 1985).

Appellants cite to *Whren v. United States*, 517 U.S. 806 (1996), for the proposition that the underlying intent or motivation of the police is irrelevant for Fourth Amendment search and seizure purposes. *Id.* at 813. But *Whren* held only that the illegitimate subjective motivation of a police officer will not invalidate an *otherwise constitutional seizure* that is "objectively justifiable" based on facts known to the officer. *Id.*; *see also United States v. Cervantes*, 219 F.3d 882, 890 (9th Cir. 2000) ("It is important to remember that the foundation of the Court's position in *Whren* is that 'where the search or seizure is based upon probable cause' there is with rare exception no balancing to be done or reasonableness determination to be made because the probable cause itself serves as the exclusive 'measure of the lawfulness of enforcement.' ") (quoting Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.4 (3d ed. 1996) (footnote omitted)); *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000) ("The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop."). In other words, although *Whren* stands for the proposition that a pretextual seizure based on the illegitimate subjective intentions of an officer may be permissible, it does not alter the fact that the pretext itself must be a constitutionally sufficient basis for the seizure and the facts supporting it must be known at the time it is conducted. *Whren*, 517 U.S. at 813. In this case, as in *Luckett*, it is undisputed that Appellants were not aware of the fact that Moreno was subject to an outstanding arrest warrant at the time they arrested him. Therefore, there are no facts from which we can conclude that the suspicionless arrest and search in this case were objectively justifiable.

Appellants' reliance on cases dealing with one's "standing" to bring a Fourth Amendment challenge, *Minnesota v. Carter*, 525 U.S. 83 (1998), *United States v. Padilla*, 508 U.S. 77 (1993), and *Rawlings v. Kentucky*, 448 U.S. 98 (1980), is likewise unavailing. In each of those cases, there was a question as to whether the person challenging the search had standing because he or she lacked a legitimate expectation of privacy in the place searched or the thing seized. *See Carter*, 525 U.S. at 91 (holding that respondent lacked standing to bring Fourth Amendment challenge based on police search of another person's home because respondent had no expectation of privacy therein); *Padilla*, 508 U.S. at 81-82 (remanding for factual determination as to whether petitioner had a legitimate privacy interest in a seized automobile in which he had no ownership interest and was not a passenger); *Rawlings*, 448 U.S. at 105-06 (holding that petitioner could not challenge the search of another person's purse because he lacked a reasonable expectation of privacy therein). By contrast, there is no question that Moreno had standing to challenge the search and seizure of his own person. *See Terry*, 392 U.S. at 9 ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.") (quoting *Union Pac. Ry. v. Botsford*, 141 U.S. 250, 251 (1891)). And, in any case, Appellants' argument relies on the assumption, which we reject, that as a result of the outstanding arrest warrant, Moreno had no Fourth Amendment rights at all.

## C. Were the Constitutional Rights at Issue Clearly Established?

[13] Having established that Appellants violated Moreno's constitutional rights when they conducted the suspicionless search and seizure, we must evaluate whether those rights were clearly established at the time of the incident and whether the "unlawfulness [of Appellants' conduct] was

apparent in light of preexisting law." *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995).

> It is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendants' actions] was apparent in light of preexisting law. Closely analogous preexisting case law is not required to show that a right was clearly established. In other words, while there may be no published cases holding similar policies constitutional, this may be due more to the obviousness of the illegality than the novelty of the legal issue.

*Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). "[W]hen an officer's conduct 'is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.' " *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)).

Deputies Banks and Garcia detained and searched Moreno based on his nervous behavior when he spotted the patrol car in an area known for high crime.[11] They contend that their actions were justified (1) because, as a result of Moreno's parole status and his outstanding arrest warrant, no level of suspicion was required in order to arrest and search him, and (2) even if reasonable suspicion was required to search Moreno, the officers had reasonable suspicion based on Moreno's nervous behavior in a high crime area. Both contentions are untenable.

---

[11]Because we view the facts in the light most favorable to the nonmoving party, we do not consider the officers' contention, which Moreno denies, that Moreno removed an object from his pocket and placed it on the ground.

Appellants' first argument in favor of qualified immunity — that it was not clearly established that Moreno had any right to be free from suspicionless searches because of his parole status and his outstanding arrest warrant — relies on the two alternate assertions discussed above, both of which must fail. When evaluating whether a law enforcement officer was on notice that his conduct was unlawful in a particular instance, we look only to the "circumstances presented to [the] officer." *Saucier*, 533 U.S. at 209. The "relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Id.* at 202 (emphasis added).

**[14]** Appellants' first assertion — that the parole search condition stripped Moreno of "a normal scope of Fourth Amendment protection" — does not justify the suspicionless search and seizure. While Moreno's parole status may have rendered it unclear what level of suspicion was required to conduct such a warrantless search, it was clearly established that a parolee was not stripped of all Fourth Amendment protection whatsoever. *Cf. Griffin*, 483 U.S. at 873 (stating that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable' ")[12]; *United States v. Guagliardo*, 278 F.3d 868, 873 (9th Cir. 2002) (rejecting the argument that a probation condition requiring submission to any search by law enforcement or probation officers was overbroad on the basis that such a search is valid if supported by reasonable suspicion); *United States v. Conway*, 122 F.3d 841, 844-45 (9th Cir. 1997) (discussing, but declining to decide, whether the search of a probationer's residence required probable cause or only reasonable suspicion); *Davis*, 932 F.2d at 758 (stating that "[t]he permissible bounds of a probation search are governed by a reasonable suspicion standard"); *Latta*, 521 F.2d at 248

---

[12]As discussed above, we have recognized that there is no "constitutional difference between probation and parole for purposes of the fourth amendment." *Harper*, 928 F.2d at 896 n.1.

(stating that "[i]t is . . . too late in the day to assert that searches of parolees . . . present no Fourth Amendment issues").

**[15]** Second, because the Deputies did not know of Moreno's parole status and his outstanding arrest warrant at the time they searched and seized him, those circumstances cannot justify their conduct. And in any case, at the time of the incident in this case, it was clearly established that the facts upon which the reasonableness of a search or seizure depends, whether it be an outstanding arrest warrant, a parole condition, or any other fact, must be known to the officer at the time the search or seizure is conducted. *Rodriguez*, 497 U.S. at 188; *Luckett*, 484 F.2d at 90-91.

**[16]** Appellants' other argument — that the officers reasonably believed that the facts known to them constituted "reasonable suspicion" — is also unpersuasive. It was well-established at the time of Moreno's detention that nervousness in a high crime area, without more, did not create reasonable suspicion to detain an individual. In *Chavez-Valenzuela*, 268 F.3d at 725, we noted that although the Ninth Circuit had not yet ruled on whether nervousness alone constitutes reasonable suspicion, the Sixth, Seventh, and Eleventh Circuit had concluded (prior to 2000) that appearing nervous is only one of several factors for finding reasonable suspicion. *See United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996). We also noted that "no circuit has held that nervousness alone suffices to create reasonable suspicion." *Chavez-Valenzuela*, 268 F.3d at 726; *see also Brown v. Texas*, 443 U.S. 47, 52 (1979) (holding that officers did not have reasonable suspicion for an investigatory stop when they detained two men who were walking away from each other in an alley in an area known for drug trafficking because "the . . . activity was no different from the activity of other pedestrians in that neighborhood"). The Supreme Court has held that in some circumstances an individual's flight from law enforcement in a high crime area

can justify an investigatory seizure. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). But Moreno's simple act of walking away from the officers could not have been reasonably mistaken for the type of "flight" the officers confronted in *Wardlow*. *See United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area[.]"). Interpreting all disputed issues of fact in favor of Moreno, as we must, we hold that no reasonable officer could have concluded that the circumstances confronted by Appellants in this case gave rise to "reasonable suspicion."

## CONCLUSION

For the foregoing reasons, we affirm the district court's denial of qualified immunity and remand for further proceedings.

**AFFIRMED and REMANDED.**

---

CLIFTON, Circuit Judge, concurring in the judgment:

I agree with my colleagues that the district court properly denied Defendants' motion for summary judgment based on their qualified immunity defense, and thus I concur in the judgment affirming the decision of the district court. I write separately, however, because I disagree with the majority's stated conclusion that the Defendants' actions violated Moreno's constitutional rights on the theory that reasonable suspicion is required to justify a search or seizure of a parolee, even though the relevant terms of Moreno's parole would appear to permit a warrantless search or seizure. The majority's conclusion to that effect is entirely irrelevant to the result reached in this case and should appropriately be disregarded.

Defendants' motion for summary judgment is based on a claim of qualified immunity. As the majority correctly notes, *ante* at 2665, the Supreme Court, in *Saucier v. Katz,* 533 U.S. 194, 201 (2001), established a two-step analysis for determining whether a law enforcement officer is entitled to qualified immunity. The first question is whether the facts alleged, taken in the light most favorable to the party asserting the injury, meaning Moreno in the current case, "show the officer's conduct violated a constitutional right." *Id.* The second question is "whether the right was clearly established." *Id.* In order to deny Defendants' summary judgment motion based on a defense of qualified immunity, we must conclude not only that Defendants violated Moreno's constitutional right, but also that the right at issue was clearly established.

As the majority notes, Defendants have argued that Moreno's Fourth Amendment rights were not violated by the detention and search in this case because these actions were consistent with Moreno's parole condition. In order to reach this question, however, the court must first determine whether Defendants can retroactively justify the arrest and search of Moreno based on his parole condition and outstanding arrest warrant, even though the officers were unaware of these facts at the time.

In addressing this question, the majority correctly concludes that

> because the Deputies did not know of Moreno's parole status and his outstanding arrest warrant at the time they searched and seized him, those circumstances cannot justify their conduct. And in any case, at the time of the incident in this case, it was clearly established that the facts upon which the reasonableness of a search or seizure depends, whether it be an outstanding arrest warrant, a parole condition, or any other fact, must be known to the officer at the time the search or seizure is conducted. [*Illinois v. Rodri-*

> *guez*, 497 U.S. 177, 188 (1990) *Rodriguez*, 497 U.S.
> at 188; *United States v. Luckett*, 484 F.2d 89, 90-91
> (9th Cir. 1973) (per curiam)].

*Ante* at 2686. On this basis alone, the court must deny Defendants' qualified immunity defense, at this stage of the case, and affirm the judgment of the district court. There is no reason to consider whether Plaintiff's parole condition altered his Fourth Amendment rights because Defendants were not aware he was on parole when they conducted the search.

Regardless, the majority reaches out to address this question and to try to announce a new rule of law — specifically, that "the Constitution requires that a law enforcement officer *must, at minimum, have a reasonable suspicion* that a parolee has engaged in criminal wrongdoing or violated his parole prior to arresting him or conducting a search of his person." *Ante* at 2678 (emphasis added). The majority supports its announcement by asserting that in *United States v. Knights*, 534 U.S. 112, 121 (2001), the Supreme Court held that "reasonable suspicion was required to search the probationer's house."[1] *See ante* at 2670. That is plainly wrong.

In *Knights*, the Supreme Court held that "*no more than* reasonable suspicion" is required to conduct a search of a probationer's house. 534 U.S. at 121 (emphasis added). Since it had already been determined that reasonable suspicion existed in that case, the Court did not need to consider whether the search in question could be supported by something less. And the Court did not simply leave that for readers to infer. It said as much, in so many words:

> We do not decide whether the probation condition so
> diminished, or completely eliminated, Knights' rea-

---

[1] As the majority notes, we have treated probationers and parolees the same for purposes of Fourth Amendment analyses. *See ante* at 2670 (citing *United States v. Kincade*, 379 F.3d 813, 817 n.2 (9th Cir. 2004)).

sonable expectation of privacy (or constituted con-
sent) that a search by a law enforcement officer
without any individualized suspicion would have sat-
isfied the reasonableness requirement of the Fourth
Amendment. The terms of the probation condition
permit such a search, but we need not address the
constitutionality of a suspicionless search because
the search in this case was supported by reasonable
suspicion.

*Id.* at 120 n.6 (internal citation omitted). *Knights* does not
support the rule which the majority opinion attempts to build
on top of it.

The history of this issue before our court further explains
why the majority opinion's declaration is unnecessary and
inappropriate in the current case. In order to hold that Defen-
dants are not entitled to qualified immunity, the court has to
determine that Defendants violated a constitutional right that
was "clearly established." *See Saucier*, 533 U.S. 195, 201
(2001). It is impossible to conclude that, at the time of the
incident in question, it was clearly established that a parolee
had a right to be free of any search or detention that was not
supported by reasonable suspicion. The *Knights* footnote
quoted above indicates as much. The *Knights* decision was
announced in December 2001. If the issue remained open at
that point in time, the rule of law which the majority opinion
in this case purports to apply here surely was not "clearly
established" twenty-three months earlier, in January 2000,
when the events at issue in this case occurred.

Moreover, the members of our court, including specifically
the members who make up the majority in this case, are very
aware of that fact, because we have history with this issue. A
three-judge panel of this court issued an opinion in May 2003
which adopted the same view as the majority in this case, that
"reasonable suspicion" was required to justify a search of a
parolee, despite parole terms which permitted search without

such suspicion, and that a search without such reasonable suspicion violated the constitutional right of the parolee. *See United States v. Crawford*, 323 F.3d 700 (9th Cir. 2003). The panel was split 2-to-1, with one judge dissenting. The author of the majority opinion in the current case was one of the two judges who formed the majority in the *Crawford* three-judge panel opinion. To be sure, that decision was not announced until more than three years after the January 2000 events at issue in this case, so it could not support any claim that the doctrine in question was clearly established at the time relevant to this matter. More importantly, that opinion was set aside when a majority of all the active judges of this court voted to rehear the case en banc. *See United States v. Crawford*, 343 F.3d 961 (9th Cir. 2003). Since the subsequent en banc panel decided not to adopt its reasoning, the opinion of the original three-judge panel has no precedential effect today.

On rehearing en banc, our court resolved that case without determining whether a suspicionless search of a parolee's residence violated the Fourth Amendment: "We need not and do not decide . . . whether suspicionless parole searches violate the Fourth Amendment." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc). It became unnecessary to reach that issue in *Crawford* because we concluded that, even assuming that reasonable suspicion was required to search a parolee's residence, the confession later given by the defendant in that case was too far removed from the allegedly improper search to require suppression of Crawford's confession.

Separately, though, five members of that *Crawford* en banc panel, most of whom also joined in the *Crawford* en banc panel majority opinion authored by Judge Graber, proceeded to address the issue of a parolee's Fourth Amendment rights and reached a conclusion different from that of the two judges who make up the majority in the current case. Specifically, as expressed in the separate concurring opinion of Judge Trott,

those five judges concluded that a law enforcement officer's search of a parolee's residence is reasonable so long as the search is not "arbitrary, capricious, or harassing." *Id.* at 1063 (Trott, J., concurring). In so concluding, the *Crawford* concurrence explicitly rejected the notion, embraced by the majority in the current case, that a parolee cannot be searched absent a degree of individualized suspicion. *Id.* at 1076. I was one of the five judges who joined Judge Trott's concurring opinion, and I continue to adhere to the position expressed there. Thus, I disagree with the reasoning and conclusion on that subject expressed in the majority opinion in the current case. Rather than repeat what Judge Trott has already written, I incorporate his discussion by reference. It is important to note that the view expressed in the *Crawford* concurrence, though not adopted by the en banc panel in that case, was not rejected by our court in that case, either.

As it happens, the two judges who support the majority opinion in the current case were also members of the en banc panel in *Crawford*.[2] They were two of the three judges who joined a dissenting opinion in *Crawford*, authored by Judge William Fletcher. 372 F.3d at 1082. The principal thrust of that dissent was the same position asserted by the majority opinion here, that a parolee search without reasonable suspicion violated the Fourth Amendment. That position was *not* adopted by the remaining eight members of the 11-judge en banc panel.

Having joined a *dissenting* opinion which took the same position just a few months ago, my colleagues are well aware that the "constitutional right" which they purport to identify in this case could not fairly be characterized as "clearly established," under the *Saucier* test. The history of the *Crawford* case makes such a conclusion impossible.

---

[2]Although that might be unremarkable in other circuits, our court utilizes a "limited en banc" court system, under which an en banc panel consists of 11 judges and does not include all active judges of our court. *See* 9th Cir. R. 35-3.

Under these circumstances, the majority's digression to assert that the Constitution requires reasonable suspicion to search a parolee, regardless of the terms of parole, amounts to no more than a frolic. Since no such "right" was "clearly established," the purported existence of such a right could never support the resolution of this case.

The majority attempts to evade this problem by stating that it was "clearly established that a parolee [is] not stripped of all Fourth Amendment protection whatsoever." *Ante* at 2685. But that is a far cry from the proposition that it was "clearly established" that a parolee search requires reasonable suspicion. Judge Trott's concurring opinion in *Crawford*, which staked out a position opposed to that of the majority here, illustrates. Judge Trott did not assert that a parolee was stripped of all Fourth Amendment protection. To the contrary, he specifically recognized that a parolee search could not be "arbitrary, capricious, or harassing." 372 F.3d at 1063. That a parolee may benefit from Fourth Amendment protection does not necessarily mean that a search cannot be conducted without reasonable suspicion. For the majority opinion here to say that it was clearly established that a parolee has not lost all Fourth Amendment protection falls far short of what is needed to sustain the rule it attempts to announce.

Moreover, the cases cited in the majority opinion do not actually support the new doctrine it announces here, because the question of whether a parolee could be searched or detained on less than reasonable suspicion did not have to be resolved in those cases, just as it did not have to be resolved in *Knights*. *See Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987) (concluding that search of probationer's home was reasonable within the meaning of the Fourth Amendment); *United States v. Guagliano*, 278 F.3d 868, 873 (9th Cir. 2002) (affirming probation requirement requiring probationer to submit to searches without considering whether particular search violated the Fourth Amendment); *United States v. Conway*, 122 F.3d 841, 845 (9th Cir. 1997 (determining that officers had

probable cause to search probationer's residence); *United States v. Davis*, 932 F.2d 752, 760 (9th Cir. 1991) (concluding that police had reasonable suspicion to conduct search); *Latta v. Fitzharris*, 521 F.2d 246, 252 (9th Cir. 1975) (finding that search was not unreasonable).

Since the "right" purportedly announced by the majority opinion here could not be held to have been clearly established in January 2000, the recognition of such a "right" cannot be the basis for denying Defendants' qualified immunity defense and for affirming the judgment of the district court. The majority's assertion that a constitutional right of Moreno was violated because reasonable suspicion is required to justify a search and seizure of a parolee is simply irrelevant to the resolution of this case.

We have held that " 'where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.' " *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (per curiam), *quoting United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc). *But see Miller v. Gammie*, 335 F.3d 889, 902 (9th Cir. 2003) (Tashima, J., concurring) (arguing that when a three-judge panel reaches a conclusion that in unnecessary to the resolution of the case, this conclusion is non-binding dicta). As discussed above, the majority's conclusion in this case that a law enforcement officer must, at minimum, have a reasonable suspicion before searching or detaining a parolee has nothing to do with the resolution of this case, and so it should not qualify as germane.

Furthermore, as the officers were not aware of Moreno's parole condition at the time of his search and detention, the facts in this case only present the hypothetical question of what level of suspicion is required when an officer searches or detains a parolee and knows of the parole status and of the

terms or conditions of parole which appear to authorize a search without warrant or "reasonable suspicion." This court has previously observed that " 'an opinion advising what the law would be upon a hypothetical state of facts' " is advisory and thus, non-binding. *See Cornejo-Barreto v. Siefert*, 379 F.3d 1075, 1082 (9th Cir. 2004) (*quoting North Carolina v. Rice*, 404 U.S. 244, 246 (1971)), *vacated as moot on other grounds* 389 F.3d 1307 (2004).

Consequently, as the majority's statement that reasonable suspicion is required to justify a search and seizure of a parolee is unnecessary to resolve this case and is a discussion regarding a hypothetical set of facts, that announcement should be treated as a bit of dictum, which should have no binding or precedential impact in future cases. That question will not be resolved by this panel, of course. The next panel of this court to encounter the underlying question may consider it. But I feel compelled to make clear my disagreement with the view expressed in the majority opinion and suggest that it be both read with caution and paid no heed in the future.